UNITED STATES

v.

**Charles R. EVANS, Corporal (E–4), U.S. Marine Corps.**

**NMCM 9801827.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 18 March 1998.

Decided 21 Sept. 2001.

LCDR Linda J. Lofton, JAGC, USN, Appellate Defense Counsel.

LT Timothy E. Curley, JAGC, USNR, Appellate Government Counsel.

LCDR Philip Sundel, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Senior Judge,
VILLEMEZ, and OZMUN, Appellate
Military Judges.

DORMAN, Senior Judge:

The appellant was tried by a general court-martial composed of officer and enlisted members. Contrary to his pleas the members found the appellant guilty of rape of a female under the age of 16, indecent assault of a different female, and false swearing concerning the indecent assault. The appellant's offenses violated Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934. The approved sentence in-

cludes confinement for 12 years, reduction to pay grade E–1, and a dishonorable discharge.

We have carefully reviewed the record of trial, the appellant's initial 23 assignments of error, the Government's response, and the appellant's reply brief. We have also considered the issues presented to us pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982) on 3 January 2001 and 8 March 2001. Following that review, we conclude that the findings and sentence are correct in law and fact and that, excepting the issue concerning the conditions of the appellant's pretrial confinement, no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).[1]

## Sufficiency of Evidence

In three different assignments of error, the appellant argues that the evidence was both legally and factually insufficient to prove his guilt of any of the crimes for which he was convicted. Following our careful review of the record we disagree. We address these issues first, so as to lay a factual background for the remainder of our decision.

**Facts.** On the morning of 29 May 1997, Lance Corporal [LCpl] P was attending a remedial physical training [PT] session in the gym aboard Camp Pendleton, CA. Staff Sergeant Bissessar ran the PT sessions. Earlier he had invited the appellant to assist a couple of female Marines with weight training. On that morning the appellant was in the gym assisting LCpl P. Following PT, the appellant gave LCpl P a ride back to her barracks room, where she was to get ready to report for duty. Along the way, the appellant apparently asked LCpl P if he could shower at her place, and she sarcastically replied yes. When they got to LCpl P's barracks, the appellant dropped her off and she went to her room on the second deck and began to get ready to report for duty. Since she had just completed working out, she hopped into the shower.

While showering, LCpl P heard the door open, but she thought it was her roommate. Soon thereafter someone entered the bathroom area of her barracks room, and through the glass shower door, she could tell that it was the appellant. She tried to hold the shower door closed but the appellant opened the door to the shower against her will and stepped into the shower with her. The appellant was naked. LCpl P turned away from the appellant, but he kissed her neck and put his arms around her, rubbing her breasts and also touching the outer edge of her vagina. She testified that after about two minutes she was able to get out of the shower. She started to dry off and get dressed. Before she was able to leave the room her roommate returned and saw the appellant in the room. When the roommate arrived the appellant was dressed and did not appear to have wet hair. Shortly, after this incident, LCpl P went on temporary additional duties and was away from her command for about a month. When she returned the appellant saw her and told her that he would be calling her. She then decided to report the incident. Also admitted into evidence were two letters that the appellant wrote to LCpl P, in which the appellant expressed his interest in her.

After LCpl P reported the incident, the appellant was called down to the Naval Criminal Investigative Service [NCIS] office on 17 July 1997 and questioned about committing

---

1. We have thoroughly considered all issues raised by the appellant, either by his appellate counsel or in his own filings. While this opinion addresses many of the issues raised we have not addressed the appellant's 12th, 13th, or 16th assignments of error. In those assignments the appellant asserts that the court-martial lacked jurisdiction because he reached the end of his enlistment after he was convicted, that the sentence is inappropriately severe, and that he was prejudiced by an alleged failure on the part of the investigators to thoroughly look for evidence comporting with the appellant's theory of the case concerning the allegation of rape. Additionally, we have not specifically addressed the appellant's hand-written Petition of a Writ of Habeas Corpus of 5 November 1998, submitted to this court as Appendix E to his brief of 29 February 1999. Finally, we have not specifically addressed those issues raised by the appellant submitted to this court on 3 January and 8 March 2001. We have not addressed any of the issues mentioned in this footnote because we have found that they have no merit and that further discussion of the issues was not required.

an indecent assault upon LCpl P. Prior to being questioned, the appellant was advised of his rights as required by Article 31, UCMJ, 10 U.S.C. § 831. During this interview the appellant admitted that he showered with LCpl P, but asserted that he believed that he had an "implied [ ] invitation to join her in the shower." Prosecution Exhibit 24 at 3. He also stated that, "[w]e have never kissed nor have I touched her in an inappropriate manner, to include touching her breasts or any part of her body below the waist." *Id.* The investigating agent administered an oath to the appellant and the appellant swore that his statement was true. The appellant was re-interviewed concerning this incident on 11 August 1997, and again was advised of his rights. During this later interview the appellant provided another sworn statement. Prosecution Exhibit 25. In this second statement, the appellant admitted that he had fondled LCpl P's breasts and vagina while they were in the shower, and that he had kissed her on the lips while embracing her in the shower. The clear indication of this second statement, like the first, was that LCpl P had consented to the appellant's advances.

In a totally unrelated incident, the appellant had sexual intercourse with Ms. N, the 14-year-old dependent daughter of a Sailor, on the evening of 9 August 1997. The appellant claims that the sexual intercourse was consensual and that it occurred on board Camp Pendleton while he was sitting in the driver's seat of his car, while she sat astride him. Ms. N testified that the sexual intercourse took place in the appellant's off-base apartment and that she did not consent to what the appellant did to her.

Ms. N testified that shortly after the appellant had sexual intercourse with her she told a friend that the appellant had raped her. That same evening she told her father that she had been raped and she was taken to the hospital, where she was examined. The exam revealed a laceration in her genitals that the examining nurse could see with the naked eye. Ms. N's vagina was red and sore, and her hymen was swollen. In the nurse's opinion Ms. N's injuries were consistent with her report of rape. The nurse was recognized as an expert in the field of sexual assault examinations. Additionally, when interviewed by police investigators, Ms. N provided a schematic of the appellant's apartment. Ms. N admitted to lying to investigators, as well as to her father about specific details concerning her activities.

Although the appellant did not testify on the merits his version of events was presented through the testimony of a detective from the San Diego County Sheriff's office, who had questioned both Ms. N and the appellant. Initially, the appellant denied that he had sexual intercourse with Ms. N. After the detective told him that fluid samples taken from Ms. N would reveal whether he had sexual relations with her, the appellant changed his version of what had happened. He then claimed that he had driven his car to an area near the barracks, where Ms. N had climbed onto his lap while he was sitting in the driver's seat of his car. The detective was aware of the type car that the appellant was driving[2], and did not think that the appellant could have had sexual relations with Ms. N in the manner the appellant described. Several days later the appellant was interrogated by an agent from NCIS, and again stated that he had sexual relations in the front seat of his car, but that his left leg was sticking out of the door, which was open. The appellant also denied that Ms. N had ever been to his apartment.

■ **Discussion.** The test for legal sufficiency requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A. 1987). That standard is met in this case.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not

2. The appellant had been driving a 4–door Mitsubishi Mirage, with bucket seats in the front seat.

The appellant is about 5'8" tall and weighs 230 pounds.

having personally observed the witnesses, this court is convinced of the accused's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). In resolving the question of factual sufficiency, we have carefully reviewed the record of trial, the arguments and briefs of counsel, and have given no deference to the factual determinations made at the trial level. Based on that review, we are ourselves convinced beyond a reasonable doubt of the appellant's guilt of each crime for which he was convicted.

Before we may affirm the appellant's conviction of any of the three offenses of which he has been convicted we must be convinced beyond a reasonable doubt of each of the elements involved in those offenses. Those elements are clearly set out in the Manual for Courts Martial. The elements of indecent assault are as follows: (1) That the accused assaulted a certain person not the spouse of the accused in a certain manner; (2) That the acts were done with the intent to gratify the lust or sexual desires of the accused; and (3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, ¶ 63b. The elements for false swearing are:

> (1) That the accused took an oath or equivalent; (2) That the oath or equivalent was administered to the accused in a matter in which such oath or equivalent was required or authorized by law; (3) That the oath or equivalent was administered by a person having authority to do so; (4) That upon this oath or equivalent the accused made or subscribed a certain statement; (5) That the statement was false; (6) That the accused did not then believe the statement to be true; and (7) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or

was of a nature to bring discredit upon the armed forces.

*Id.* at ¶ 79b.

Finally, the elements for rape are:

(1) That the accused committed an act of sexual intercourse; and (2) That the act of sexual intercourse was done by force and without consent.

*Id.* at ¶ 45b.

■ In his assignments of error the appellant attacks the credibility of both of his female victims. He accurately notes that at trial both victims either admitted to having made misrepresentations throughout the investigation, or were impeached by testimony on collateral issues. Nevertheless, we find both of their testimonies to be credible as it relates to the proof of the elements of the offenses, and are not distracted by minor discrepancies and/or misrepresentations. We find no credible reason for the two victims to have fabricated evidence against the appellant, only to then be subjected to the scrutiny of numerous interrogations and testimonies concerning matters that relate to their own sexual privacy. At trial, both victims testified about the required elements of the offenses. Both victims were consistent in their respective testimony regarding the basic facts of the pertinent offenses. While they both may have misrepresented other facts, we find those credibility issues to be inconsequential.

■ Concerning his conviction for false swearing the appellant argues that the Government failed to prove the 6th element, that the accused believed the statement to be false. The appellant asserts that the Government's evidence regarding this element was the two "contradictory" statements that the appellant provided to NCIS. In the first statement he denied that he kissed or touched the victim in an inappropriate manner. The statement, as prepared and sworn to by the appellant, contains the following: "[w]e, have never kissed nor have I touched her in an inappropriate manner, to include touching her breasts or any part of her body below the waist." Prosecution Exhibit 24 at 3. In his subsequent statement he indicated that he had touched her and kissed her, but

that it was consensual. Prosecution Exhibit 25. The appellant now argues that the two statements do not contradict each other, since his touching LCpl P was consensual, the touching was appropriate. Appellant asserts that since this is the only evidence the Government introduced on this element, his conviction should be set aside. The appellant, however, totally discounts the testimony of LCpl P. Even without the appellant's second statement, we would find the evidence sufficient to affirm the appellant's conviction for false swearing.

Regarding the appellant's assignments of error attacking the legal and factual sufficiency of the evidence, we find no merit in his arguments. We have applied the standards of review set out above to this issue and are convinced beyond a reasonable doubt that the evidence is legally and factually sufficient to prove all the elements of the three charges.

### Illegal Pretrial/Post–Trial Punishment

■ In the appellant's first assignment of error he alleges that the conditions of his pretrial confinement constituted pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813. In his second assignment of error the appellant argues that he was subjected to cruel or unusual punishment, due to the conditions of confinement and deprivation of medical care while confined at the Camp Pendleton brig following his conviction, prior to his transfer to the U.S. Disciplinary Barracks, [USDB] Fort Leavenworth, KS. As a remedy he seeks 5 days credit for each day he was confined at the Camp Pendleton brig.

The appellant was placed in pretrial confinement on 18 August 1997. Appellate Exhibit XXXII and XXXVIII; Record at 216. The stated reason for his pretrial confinement was "due to the results of an Interim Report of Investigation for violation of Article 134, UCMJ, 10 U.S.C. § 934, Indecent Assault (on-base, female Marine victim) and an ongoing investigation by NCIS/Civilian Authorities for Statutory Rape of a 14 year old female (civilian)." Commanding Officer, 9th Communication Battalion letter of 19 Aug 1997, Appellate Exhibit XXXII at 4;

Record at 223. Thus, at the time the appellant was placed in pretrial confinement, the maximum length of confinement that he faced for a *military offense* was 5 years for the indecent assault, MCM (1995 ed.), Part IV, ¶ 63e, not life imprisonment as the Government argued at trial, and now on appeal. On 3 September 1997, however, while the appellant was in pretrial confinement, a charge of rape was preferred against the appellant and two days later it was forwarded to an Investigating Officer to conduct an Article 32, UCMJ, Investigation into that charge, as well as others. The Government did not present evidence at trial that the brig was informed of the preferral of these charges.

When the appellant was placed in pretrial confinement, the duty section leader in the brig assigned him to Special Quarters 1.[3] Appellate Exhibit XXXVIII at 1; Record at 216. The next day the brig's Classification and Assignment Board approved that classification. Appellate Exhibit XXXVIII at 1; Record 259. The decision to keep the appellant in Special Quarters 3 was reviewed six times, at 30–day increments, after his confinement and prior to trial on the merits of his case. Following imposition of sentence by the members, the appellant remained in Special Quarters 1 until he was transferred to the USDB on 22 October 1998.

The appellant was placed in Special Quarters 1 due to the seriousness of the charges he was facing, in that the brig apparently believed that he potentially could have been sentenced to more than five years of confinement. Brig personnel considered the possibility of lengthy confinement in determining that the appellant was a possible escape risk. Record at 260. Such a sentence would have required the appellant to be transferred to the United States Disciplinary Barracks at Fort Leavenworth, Kansas.

While in special quarters the appellant was segregated from other prisoners, and housed in a 6 by 9–foot windowless cell for 23 hours a day, Monday through Friday. The appellant's cell had concrete walls and a metal door. There was a slot on the door through which items could be passed, or the appellant

---

3. The term Special Quarters 1 refers to the maximum-security section of the brig.

could be observed. Inside the cell there was a bed and a metal, uncovered, toilet with an attached faucet. In one corner of the cell are four shelves to store clothes and personal belongings. The appellant was not allowed to lie on his bed between 0500 and 2200.[4] All meals were eaten in his cell.

The appellant was allowed out of the cell for 1 hour a day for recreation in another cell-block. The only opportunity to shower was during this 1 hour recreation period. Furthermore, whenever out of the cell the appellant was placed in leg and hand restraints and was accompanied by two escorts. These restraints were even used during visits with family members, even though the visits were non-contact, and they were conducted through a Plexiglas window.

During the appellant's pretrial confinement, members of his command visited him at least 23 times. Appellate Exhibit XXXIV. He was also frequently seen by medical personnel, but did not raise medical issues with members of his command until after he was injured in the brig on 10 February 1998. On that date he fell into the metal door of his cell. Subsequently, he was unable to walk and was using a wheel chair. Appellate Exhibit XXXV. The Brig Officer, Chief Warrant Officer 3 Mershon testified that an individual with medical problems could be placed in special quarters, but probably in Special Quarters 2 vice 1. Special Quarters 2 is more of an administrative segregation. Record at 277–78. He also testified that all detainees facing more than 5 years confinement would be assigned to special quarters. Record at 276.

Article 13, UCMJ, 10 U.S.C. § 813, prohibits the intentional imposition of pretrial punishment, and also the imposition of restrictions on liberty which exceed that needed to ensure an accused's presence for trial. *United-*

*ed States v. McCarthy*, 47 M.J. 162, 165 (1997). We find no evidence of record of intent to punish the appellant by placing him in Special Quarters 1. As we have found in other cases, however, we find that the decision to place the appellant in Special Quarters 1 was made in conformance with the standard operating procedures [SOP] then in existence within the brig at Camp Pendleton. *See e.g. United States v. Anderson*, 49 M.J. 575, 576–77 (N.M.Ct.Crim.App.1998); *see also United States v. Scalarone*, 52 M.J. 539, 543–44 (N.M.Ct.Crim.App.1999) *aff'd*, 54 M.J. 114 (2000)(finding a similar policy at another brig to be arbitrary). That SOP required that anyone facing more than five years confinement to be automatically placed in Special Quarters 1. Accordingly, we find that the decision to place the appellant in Special Quarters 1 was based on an arbitrary policy and resulted in the imposition of conditions more rigorous than necessary to insure his presence for trial. We further find that it would have been appropriate to segregate the appellant from the rest of the prison population after he was placed in a wheel chair. The brig's decision to continue the appellant's confinement in Special Quarters 1, however, even after he could no longer walk, was also arbitrary and far more restrictive than was necessary to ensure the appellant's presence for trial. Accordingly, we will grant relief for illegal pretrial confinement in our decretal paragraph.[5]

In his second assignment of error, the appellant asserts that the conditions of his confinement after his conviction violate both the Eighth Amendment to the Constitution and Article 55, UCMJ, 10 U.S.C. § 855. Specifically, the appellant contends that he was subjected to solitary confinement and that the brig staff and his command demonstrated a deliberate indifference to his medi-

---

4. No explanation is given for the restriction. Given the limited space and facilities of those confined to special quarters, such a restriction could be considered as evidence of intent to punish.

5. Although the military judge denied the appellant's request for credit for illegal pretrial confinement, and made essential findings (Record at 290–91), we find that they do not address the issue of whether the conditions of the appellant's

pretrial confinement were more rigorous than necessary to insure his presence for trial. While we adopt his findings as being factually accurate, his legal conclusion only addressed the issue of whether the appellant had been subjected to pretrial punishment. We have thus reviewed the legal issue *de novo*. We also note that the military judge decided this issue almost nine months prior to our decision in *Anderson*.

cal condition. Appellant's Brief of 29 Feb 2000 at 7–12. He raises this issue for the first time on appeal. Because the appellant claims that the cruel and unusual punishment occurred primarily prior to the date of the convening authority's action [17 September 1998], we have exercised our broad discretionary powers to examine the sentence for legal error. *United States v. Jenkins,* 50 M.J. 577, 582 (N.M.Ct.Crim.App.1999).

■ We have already set out the conditions under which the appellant was confined in Special Quarters 1 prior to his trial. He has alleged nothing different concerning those conditions after he became a sentenced prisoner on 18 March 1998. Concerning his argument that he was subjected to solitary confinement he relies upon *United States v. Stiles,* 9 USCMA 384, 26 C.M.R. 164 (1958). We find no merit in this argument.[6]

First, *Stiles* addressed the issue of a court-martial sentence wherein the accused had been sentenced to solitary confinement for one month. The focus, thus, was on the issue of whether the court had the authority to award solitary confinement as a punishment. It did not even address the conditions under which Private Stiles served out his sentence to confinement. Nowhere does *Stiles* suggest that administrative segregation or special quarters equate to solitary confinement. Furthermore, we find that the appellant has not shown that he was subjected to solitary confinement. The evidence in this case demonstrates that the conditions within Special Quarters 1 did not equate to solitary confinement. The appellant was visited at least 23 times prior to trial by command visitors. He interacted on a daily basis with brig personnel, as well as medical personnel. Religious services were also available to him. He was allowed out of his cell for an hour a day, where he was able to interact with other prisoners, shower, workout, and/or watch television. He was also allowed non-contact visits from family members. While we fully recognize the restrictive conditions of Special Quarters 1, those

conditions did not subject the appellant to solitary confinement. Furthermore, even if it did, the conditions imposed in this case were not "cruel and unusual under contemporary standards of decency." *United States v. Martinez,* 19 M.J. 744, 748 (A.C.M.R.1984)(citing *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

■ The appellant relies upon *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), for the proposition that deliberate indifference to a prisoner's medical needs constitutes a violation of the Eight Amendment and Article 55, UCMJ. *Gamble,* however, was not decided in the context of the legality of a sentence, but rather was a tort action filed under 42 U.S.C. § 1983. Nevertheless, it does clearly state, "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eight Amendment." *Gamble,* 429 U.S. at 104, 97 S.Ct. 285 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In *Gamble* the Supreme Court accepted Gamble's handwritten allegations as true, but then concluded that they did not state a cause of action under 42 U.S.C. § 1983 against the doctors. The Court remanded the case to the Court of Appeals to determine whether a cause of action had been stated against the prison officials.

In the case before us, there is no evidence in the record concerning the appellant's post-trial allegations. We do have the benefit, however, of the appellant's clemency request of 30 July 1998. Enclosure 11 to that request is labeled "Excerpts of Brig Medical Records of Cpl Evans." In fact the appellant invites our attention to these medical records. Appellant's Brief of 29 Feb 2000 at 8.

As the Supreme Court did in *Gamble,* we have reviewed the medical records that the appellant has made available to us and con-

---

6. We have also considered the fact that the appellant remained in special quarters following his conviction and imposition of sentence. We do not find his post-conviction classification within the brig to be in violation of either the Eighth

Amendment or Article 55, UCMJ. Given the appellant's sentence, brig officials at Camp Pendleton obviously expected that the appellant's confinement there was temporary and that he would be transferred to the USDB.

clude that there is no merit to the appellant's argument. Beginning the day after he was sentenced, the records document that the appellant was seen by medical professionals at least 16 times prior to 17 July 1998. The appellant also notes that he received some physical therapy shortly before his transfer to the USDB. Appellant's Brief of 29 Feb 2000, Appendix B at 9. Additionally, the record of trial reveals that medical personnel provided daily checks on prisoners housed in Special Quarters 1. Accordingly, we find that the appellant has failed to demonstrate that either medical personnel or the brig staff exhibited a deliberate indifference to his serious medical needs.

### Speedy Trial

In his third assignment of error the appellant argues that the military judge erred in denying his motion to dismiss based upon a denial of his right to a speedy trial under Article 10, UCMJ, 10 U.S.C. § 810, and RULE FOR COURTS-MARTIAL 707, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Appellant's Brief of 29 Feb 2000 at 12–15. In this case the appellant was placed in pretrial confinement on 18 August 1997. On 7 November 1997 the charges were referred, served upon the appellant and the first trial session held. Exercising his right to a five-day waiting period between service of charges and trial, the appellant was not arraigned until 13 November 1997, at which time the parties agreed to a trial schedule. Trial on the merits did not begin until 10 March 1998, and the appellant was not sentenced until 18 March 1998.

■ As with the previous motions, this issue was raised at trial and the military judge entered findings of fact. Record at 67–68. Indeed, the parties stipulated to most of the essential facts. Record at 24–25. Additionally, the original trial counsel was called as a witness, and he identified pages 4–11 of Appellate Exhibit II as a chronology of the case. Record at 32–34. This chronology is far more detailed than the essential findings made by the military judge. As with the motions addressed above, we review the military judge's decision denying the speedy trial motion under a dual standard. His factual determinations are reviewed un-

der a clearly erroneous standard, and his legal conclusions are reviewed *de novo*. *United States v. Doty*, 51 M.J. 464, 465 (1999). We have reviewed the factual findings of the military judge. Finding that they are not clearly erroneous, we adopt them as our own. Record at 67–68.

■ An accused is entitled to have charges dismissed under R.C.M. 707 if it takes more than 120 days to bring him to trial. For purposes of the rule, time begins to run on the earlier of the date charges are preferred or the date pretrial restraint is imposed, and it continues to run until the accused is arraigned. R.C.M. 707(b)(1). In this case the appellant was arraigned on the 88th day of his pretrial confinement. Article 10, UCMJ, states in pertinent part that "when any person subject to this chapter is placed in ... confinement prior to trial, immediate steps shall be taken ... to try him or to dismiss the charges and release him." An Article 10 speedy trial violation occurs where the record shows that the Government could have proceeded to trial much sooner, but "negligently or spitefully chose not to" do so. *United States v. Kossman*, 38 M.J. 258, 261 (C.M.A.1993). "Brief periods of inactivity in an otherwise active prosecution are not unreasonable or oppressive." *Id.* at 262. To determine whether reasonable diligence was exercised, we apply a "balancing test" based on the following factors: (1) length of delay, (2) reasons for the delay, (3) demand for speedy trial by the accused, and (4) demonstrable prejudice to the accused. *United States v. Garner*, 39 M.J. 721, 727 (N.M.C.M.R.1993).

■ The main thrust of the appellant's argument is that even though he was arraigned on day 88, the Government was not prepared to go forward with evidence, in fact the appellant refers to the arraignment as a "sham." Appellant's Brief of 29 Feb 2000 at 14. At arraignment, however, the appellant reserved both motions and pleas and agreed to a proposed trial schedule. Record at 10–11. In his findings, the military judge determined that the Government was prepared to go to trial on 7 November 1997, 5 days prior to arraignment. We find no evidence to the contrary. At trial the appellant argued that

the Government was not prepared for trial on the date of arraignment, because it did not possess the results of DNA testing as of that date. Record at 66. We note, however, that the Government is not required to have its best case ready for trial to stop the running of the speedy trial clock for purposes of R.C.M. 707. Nor is the Government prohibited from perfecting its case in the interim between arraignment and the close of the Government's case on the merits. Based on the evidence before us we do not find a violation of R.C.M. 707, nor do we find any evidence that the appellant's arraignment on 13 October 1997 was a "sham." *See Doty*, 51 M.J. at 465.

The record is equally devoid of any indication that the Government "negligently or spitefully" chose to delay proceeding with trial. Indeed the unrebutted testimony of the original trial counsel reveals an abundance of activity with a view to bringing this case to trial, particularly in light of the fact that several of the charges were being investigated by different jurisdictions. Applying the standards contained in *Kossman*, 38 M.J. at 258, and the balancing the factors relied upon in *Garner*, 39 M.J. at 721, to include the fact that the appellant never demanded a speedy trial, we reject the appellant's argument that he was denied a speedy trial under Article 10, UCMJ.

## Suppression of Appellant's Statements

The appellant next argues that the military judge erred in denying the appellant's motion to suppress his signed pretrial statement. Appellant's Brief of 29 Feb 2000 at 16–19. This statement, Prosecution Exhibit 24, was the basis for the appellant's conviction for making a false statement under oath. The appellant argues that, under the totality of the circumstances surrounding the taking of the statement, his will was overborne, and the statement was not voluntarily given. He cites the following as factors as supporting his argument: he was fatigued when he arrived to be interviewed; the interview lasted

over five hours; he fell asleep in the interview room; he was kept locked in a small room during the process; the interrogator was armed with a weapon and that he used a ruse during the interrogation.[7] The appellant's motion to suppress was litigated at trial. Record at 69–153. The military judge issued essential findings and denied the motion, finding that the appellant's statement was "voluntary and not obtained through the use of coercion, unlawful influence, or unlawful inducement." *Id.* at 153.

When an accused challenges the voluntariness of his pretrial statement, the Government bears the burden of proof. That burden requires proof by a preponderance of the evidence that the statement was made voluntarily. *United States v. Cottrill*, 45 M.J. 485, 488 (1997). The question of whether a pretrial statement by an accused is voluntary is a question of law which we review *de novo*. *United States v. Bubonics*, 45 M.J. 93, 94 (1996). This requires an assessment of the totality of all the circumstances surrounding the production of the accused's statement. *Bubonics*, 45 M.J. at 95 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

In this case the appellant had been working 12 hour shifts, from 1800 until 0600 the following morning, for several days prior to the interview. Even on the date of the interview the appellant had come off a 12–hour shift about four hours before the interview began. As the interview began, the appellant was advised of his rights and he executed a waiver of his rights. The appellant even informed the agent that he was tired. The interview began at 1017 and lasted until the appellant signed his statement at 1526 hours. The interview itself was essentially over by 1248, when the NCIS Agent began to prepare the appellant's statement. Although the appellant was tired, he never asked to terminate the interview, and accord-

---

7. We note with disapproval factual errors in the appellant's brief. First, the appellant was not kept locked in an interview room the entire time he was at the NCIS office. In fact, the period of time he was locked in an interview room was a relatively short period of time during the entire process. Second, the testimony of the NCIS Agent who conducted the interview, testimony that was not contradicted, was that he was not armed during the interview. Record at 94.

ing to the unrebutted testimony of the NCIS Agent, the appellant became more engaged later on in the interview process, as he demonstrated what had happened between himself and the victim of the indecent assault. This is not a case of the appellant being constantly interrogated for five hours. The appellant even fell asleep during a period of time that he was left alone in an interview room. The appellant was afforded water, rest room breaks, and the interview process took place in three different areas of the NCIS office. On the day of the interview the appellant was a 25–year–old Corporal who had been on active duty for seven years. He was considered by the agent who interviewed him, as well as by his enlisted supervisor, to be well spoken and articulate.

Although we are not bound by the findings of fact reached by the military judge, see *Bubonics*, 45 M.J. at 96 n. 3, we find that in this case the military judge's findings of fact are right on the mark. We adopt them as our own. Record at 153. Even accepting the appellant's version of the facts as true, we would not find his statement to be the product of his overborne will in this case. Accordingly, we reject this assignment of error and find that the military judge did not err in denying the motion to suppress the appellant's pretrial statement.

### Severance

During the motions phase of the appellant's court-martial, he moved to sever the indecent assault of LCpl P and the unlawful entry into her barracks room from the other charges, to include a charge of rape, pending before the court. Appellate Exhibit XV; Record at 164–70.

 We review a military judge's decision denying a motion to sever for an abuse of discretion. *United States v. Southworth*, 50 M.J. 74, 76 (1999). Furthermore:

[A]n abuse of discretion will be found only where the defendant is able to show that the denial of a severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him with a better opportunity for an acquittal.

*United States v. Duncan*, 53 M.J. 494, 497–98 (2000)(quoting *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir.1998)). In examining whether an appellant has been able to demonstrate such prejudice we look to see 1) whether the evidence of one offense could be used to prove the other; 2) whether a limiting instruction was given; and 3) whether the findings reflect an impermissible spillover. *Southworth*, 50 M.J. at 77; see *also Duncan*, 53 M.J. at 498. Applying these standards with the benefit of hindsight, *see United States v. Silvis*, 31 M.J. 707, 709 (N.M.C.M.R.1990), we find that the military judge did not abuse his discretion when he denied the appellant's severance motion.

In arguing that the military judge abused his discretion in denying the severance motion, the appellant asserts that improper spillover occurred, because the evidence of each victim's case was weak. He also argues that evidence of one offense could not be used to help prove the other offense, and that the limiting instruction given by the military judge was inadequate. Appellant's Brief of 29 Feb 2000 at 29–33.

 R.C.M. 601(e)(2) authorizes the joinder of charges for trial before the same court-martial. Joinder of charges is favored in trials by court-martial, in part because of unitary sentencing. *United States v. Foster*, 40 M.J. 140, 147 (C.M.A.1994); *Silvis*, 31 M.J. at 709. Severance of charges is authorized "to prevent manifest injustice." R.C.M. 906(b)(10).

 In the case before us there was no manifest injustice. We do not find that the evidence of each sexual assault, standing alone, was weak. In our review of the evidence, in which we have carefully considered the evidence of each offense separately, we find the evidence of the appellant's guilt compelling. We also note that at trial the evidence concerning each sexual assault was primarily segregated (bifurcated) from the other. Additionally, the military judge gave the spillover instruction requested by the appellant. Record at 1138–39, Appellate Exhibit LVIII ¶ L. This instruction is also the standard spillover instruction used in court-martial practice. Military Judges' Benchbook, Dep't of the Army Pamphlet 27–9 at

837 (30 Sep 1996). Finally, we note that there is no evidence to suggest that the court members did not distinguish between the two sexual assault offenses. In fact they acquitted the appellant of two charges, one of which was related to the indecent assault offense. Accordingly, we find no merit in this assignment of error.

### Unlawful Command Influence

 The appellant also claims that he was the victim of "unlawful command influence" arising from collusion of the convening authority and trial counsel, by the failure to randomly and impartially choose members from a fair cross section of the base-wide community. The core of this assigned error is that only two African–American members were on the panel of 11 members. One of the African American members was removed before trial and the other was challenged by the Government with a preemptory challenge. We review any allegation of unlawful command influence *de novo*. *United States v. Villareal*, 52 M.J. 27, 30 (1999).

In this case, the first African–American member was removed from the panel after trial was set to begin, because he was absent when the members were called to be impaneled. At that point in the trial, the trial counsel called the convening authority, who orally dismissed the member so the trial could commence. At the time, no one knew where the member was. Coincidentally, after he was removed and the trial began, the member appeared. A reason for his delay has not been alleged, nor have we received any information that would cause us to conclude his delay was caused by the convening authority so as to remove him from the panel.

The other African–American member was challenged for cause by the trial counsel. The military judge denied the government's challenge for cause, but approved his removal through use of the Government's preemptory challenge. The military judge found that trial counsel had enunciated a real race-neutral reason for the challenge.[8] Record at 430–31.

While recognizing that the threshold is generally low for triggering an inquiry into allegations of improper command influence, we find that the appellant has not even come close to meeting his minimum burden of producing sufficient evidence to raise this issue. *See United States v. Ayala*, 43 M.J. 296, 299–300 (1995); *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A.1994); *United States v. Levite*, 25 M.J. 334, 341 (C.M.A.1987)(Cox, J., concurring). "[G]eneralized, unsupported claims of [improper influence] will not suffice to create a justiciable issue." *Green v. Widdecke*, 19 C.M.A. 576, 579, 42 C.M.R. 178, 181 (1970). Nor will "[p]roof of [unlawful influence] in the air" suffice. *See United States v. Allen*, 33 M.J. 209, 212 (C.M.A.1991). The appellant has not produced any evidence— beyond pure speculation—of unlawful influence that would compel us to shift the burden to the Government to disprove that such occurred. We reject this assignment of error as meritless.

### Challenge for Cause

 Subsequent to *voir dire*, the appellant challenged the senior member and First Lieutenant Lee for cause. The military judge denied both challenges. The appellant then exercised a peremptory challenge as to the senior member. In so doing the appellant specifically stated that but for the military judge's denial of the challenge for cause against the senior member, he would have exercised his peremptory challenge against 1stLt Lee. By doing so, the issue was preserved for our review. *United States v. Jobson*, 31 M.J. 117, 120 (C.M.A.1990); *see* R.C.M. 912(f)(4). The appellant argues that the military judge erred in denying his challenge for cause against 1stLt Lee.[9] We find no merit to this argument.

---

8. Trial counsel offered reasons that included that the member talked to the appellant while the appellant was in pretrial confinement, that they were seen together at the gym, and that he had talked to other people about the case. Record at 430.

9. We note with displeasure that counsel for both the appellant and the Government indicate in their briefs that 1stLt Lee had served as a legal officer. There is no evidence of her having performed such duties in the record. *See* Record at 397–404 and Appellate Exhibit XLVI at 25. Furthermore, contrary to the argument of the Gov-

During *voir dire*, 1stLt Lee stated that she had attended a four-week Legal Officer's Course taught by the Naval Justice School Detachment in San Diego just a few months before the appellant's trial. There were four main topics addressed in the course, criminal law, civil law, procedure, and evidence. She stated that for the most part the course taught her where to go to find answers to legal questions. The course also addressed the burden of proof at a court-martial and an overview of the punitive articles and maximum punishments. While there she participated in two mock administrative separation boards, where the board members voted to retain one member and separate the other. Following questioning by the appellant's counsel, the military judge twice emphasized the difference between an administrative board and a court-martial, and 1stLt Lee stated that she understood those differences and the different burdens of proof. Record at 400–04.

In making his challenge for cause against 1stLt Lee, the appellant's counsel couched the challenge in the following terms:

DC: Sir, the defense challenges for cause First Lieutenant Lee. We believe that her recent NJS training at the Legal Officer's Course will affect her ability to sit here and give an unbiased opinion.

Additionally, to properly sit and take on board the instructions from the military judge, we believe that she'll use her experiences from the NJS from using the ad boards and apply them here at this court-martial which would be completely improper.

Record at 429. Thereafter, the Government responded, noting 1stLt Lee's candidness, her comment that she was not a lawyer, and that she would follow the instructions given to her by the military judge. The military judge then denied the challenge against 1stLt Lee. *Id.*

We turn then to whether the military judge correctly denied the defense's challenge for cause against 1stLt Lee. Rule for Courts–Martial 912(f)(1)(N) provides that "[a] member shall be excused for cause

whenever it appears that the member ... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." Our superior Court recently reviewed the law applicable to this situation:

R.C.M. 912(f)(1)(N) encompasses "both actual bias and implied bias." R.C.M. 912(f)(3) provides: "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." Military judges should be "liberal in granting challenges for cause."

"The test for actual bias [in each case] is whether any bias 'is such that it will not yield to the evidence presented and the judge's instruction.'" "[A]ctual bias is reviewed" subjectively, "through the eyes of the military judge or the court members."

Actual bias is a question of fact. Accordingly, the military judge is given great deference on issues of actual bias, recognizing that he or she "has observed the demeanor of the" challenged party. "[W]e will not overturn the military judge's" denial of a challenge unless there is "a clear abuse of discretion in applying the liberal-grant mandate."

On the other hand, implied bias is "viewed through the eyes of the public." "The focus 'is on the perception or appearance of fairness of the military justice system.'" There is implied bias "when 'most people in the same position would be prejudiced.'" We give the military judge less deference on questions of implied bias. On the other hand, we recognize that, when there is no actual bias, "implied bias should be invoked rarely."

*United States v. Warden,* 51 M.J. 78, 81–82 (1999)(internal citations omitted).

After reviewing the *voir dire* responses of 1stLt Lee, we hold that the military judge did not abuse his discretion in denying the challenge for cause. Specifically, we find that 1stLt Lee exhibited an appropriate understanding of the distinction between administrative discharge boards and the decisions she would have to make at a court-

ernment, there is no evidence that Lt Lee served as a Recorder in a moot admin board while

attending the Legal Officer's Course at Naval Justice School.

martial. Record at 403–04. We find no evidence of actual bias, and the record does not reasonably suggest implied bias.

### Defense Continuance Request

In his 22nd assignment of error, the appellant alleges that he was denied his right under the Constitution to present a defense when the military judge denied his request for a continuance to investigate the possibility of newly discovered exculpatory evidence. Record at 1052–55. Just prior to the resting its case, the defense raised this issue with the military judge. Significantly, even when asked directly by the military judge on two occasions, the appellant failed to specifically request a continuance on the record. He did suggest that he needed more time to investigate the possibility that the handwriting on the appellant's rights advisement and statement of 17 July 1997 was not genuine. The trial defense counsel proffered that without his knowledge, a female, named Dr. Clarke, had visited the appellant while he was in pretrial confinement. Dr. Clarke then obtained a copy of the document and a copy of the appellant's handwriting, and passed it to a legitimate handwriting expert. The examiner stated that the handwriting on the 17 July 1997 (Prosecution Exhibit 24) statement may not be the appellant's, but he needed the original to make the determination. The trial defense counsel proffered that he learned of this information only moments before he raised it with the military judge. Record at 1052–55.

▪▪▪▪ The standard of review of a military judge's decision to deny a continuance is an abuse of discretion. There is an abuse of discretion where the reasons or rulings of the military judge are clearly untenable and deprive a party of a substantial right such as to amount to a denial of justice. *United States v. Weisbeck*, 50 M.J. 461, 464 (1999).

▪▪▪▪ Upon being informed of the possibility that this evidence may exist, the military judge heard argument from counsel. Trial counsel noted that the Special Agent who took the appellant's statement testified that he personally observed the accused sign the rights waiver and statement. Record at 1055. The military judge stated that even if

the handwriting examiner, "got the originals and we don't know what his conclusions would be based upon the originals, he may conclude that it's not a forgery in which case it would be much ado about nothing or even if he concluded that there was a forgery, then we'd be back into the situation where [the NCIS Agent] would be countering [the handwriting examiner's] testimony with his eyewitness observation of the accused signing that statement." Record at 1055. He concluded the discussion of this issue by stating that he was "not going to delay this trial any further to pursue this very, very conjectural—in my opinion, very, very conjectural possibility." *Id.*

Later the subject was revisited when the trial defense counsel addressed why he did not bring the issue up earlier. In response the military judge stated that, "Had there been an issue, I believe, with respect to whether or not Corporal Evans did or did not sign the 17 July 1997 statement to NCIS. There is no question in my mind that you would have brought that forward earlier in the proceedings." Record at 1082. The trial counsel added that the expert in question was reputable, and that his standard practice was to say he needed the originals, and payment before he could make any conclusion. The military judge said, "So the bait is, there might be a possibility that this is a forgery. Let me see the original and some money, I'll analyze it and then it may or may not be forgery." Record at 1083. The judge also noted his belief of the likelihood that, if the appellant's signature on Prosecution Exhibit 24 was not genuine, that "the defense would have discovered this probably during the first interview with Corporal Evans." Record at 1084.

Although the military judge does not expressly state that the accused could have taken the stand for the limited purposes of the motion and denied signing the statement, it is apparent he understood that. To date the appellant has never indicated that he did not sign the statement. Thus, the appellant has not even taken the first step in carrying his burden to establish that the continuance was necessary to obtain exculpatory evidence. Under the circumstances presented

to the military judge, to include information concerning Dr. Clarke's conviction in Federal District Court for the unauthorized practice of law, record at 1080, we find no abuse of discretion.

## Instructions

 The appellant has raised six assignments of error in which he argues that the military judge erred in the instructions that he gave, or failed to give. We begin our discussion of these issues by noting the standard of review for instructional error. The decision to give an instruction and the "substance of an instruction" is reviewed *de novo*. *United States v. Smith*, 50 M.J. 451, 455 (1999) (citing *United States v. Maxwell*, 45 M.J. 406, 424–25 (1996)). The failure, however, "to object to an instruction or to [the] omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error." R.C.M. 920(f); see also *United States v. Robinson*, 38 M.J. 30, 31 (C.M.A.1993)(citing *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977))(stating that, "It is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."). Finally, we review a military judge's decision not to give a defense-requested instruction under an abuse-of-discretion standard. *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A. 1993). In such cases, in determining whether there was error, we look to three factors. First, was the requested instruction correct? Second, is the requested instruction substantially covered in the instructions given? Third, does the instruction concern an issue that is so vital to the defense case, that the refusal to give the instruction would deprive the accused of the defense, or seriously impair its presentation? *Damatta–Olivera*, 37 M.J. at 478.

In the first instructional issue the appellant asserts that the military judge erred when giving the instruction concerning false swearing. He alleges two errors. First, that the military judge failed to advise the members that the appellant had said that he had never touched LCpl P in an "inappropriate" manner. Second, he alleges that the military judge should have instructed the members that the appellant's second statement "had to directly contradict [his] alleged false statement." Appellant's Brief of 29 Feb 2000 at 21.

In rejecting the appellant's argument we first note that the appellant did not object to the instruction. Record at 1077 79, 1144. Accordingly, absent plain error, the issue has been waived. We specifically find no plain error. We also note that the instruction comports with the language contained in Specification 2 of the Second Additional Charge. Additionally, there was no requirement that the Government prove that an inconsistency existed between the two statements the appellant made concerning the indecent assault on LCpl P, in order to prove the offense of false swearing. We find no error in the instruction given by the military judge on this issue.

In the second instructional issue, the appellant asserts that the military judge erred in instructing on the defense of the mistake of fact. Specifically, he finds error in the instruction wherein the military judge told the members that "it is no defense that the accused was ignorant or misinformed as to the true age of the alleged victim." Appellant's Brief of 29 Feb 2000 at 35.

Again we note that this issue was waived by the failure of the appellant to voice his objection at trial. Finding no plain error, we reject the appellant's argument. While it is true that the military judge instructed the members that "it is no defense [to carnal knowledge] that the accused was ignorant or misinformed as to the true of the alleged victim," we find no error in the instruction. Furthermore, even if there were error, given the fact that the members convicted the appellant of rape, the error would be harmless. We find no error, however, because the military judge did properly instruct on the defense of mistake of fact concerning the victim's age. Record at 1133. Indeed the defense arises where the appellant can demonstrate by a preponderance of the evidence that he had an honest and reasonable belief that the victim was at least 16 years of age. The defense is not based upon ignorance, and could only be based upon "misinforma-

tion" which could lead to an honest and reasonable belief that the victim was at least 16 years old. Taken as a whole, though not an example of clarity, the military judge properly instructed the members on this issue.

The appellant's third assignment of instructional error alleges that the military judge erred when he failed to give curative instructions following improper argument by the prosecutor. Specifically, he alleges that the trial counsel argued facts that were not in evidence, and that the trial counsel improperly commented upon the appellant's "right to remain silent." Appellant's Brief of 29 Feb 2000 at 36–39.

Concerning this third instructional issue, we initially note that the appellant did not object to the argument of the trial counsel at trial. That failure constitutes waiver of this issue. R.C.M. 919(c), *United States v. Reist*, 50 M.J. 108, 110 (1999); *United States v. Conway*, 40 M.J. 859, 863 (A.F.C.M.R.1994). Furthermore, we find no error in the argument of the trial counsel. With respect to the allegation that trial counsel argued facts not in evidence, we find that the comments of the trial counsel were fair comments based upon his interpretation of the evidence presented and the inferences that could be drawn therefrom. R.C.M. 919(b). With respect to the trial counsel's comment's concerning the appellant's decision to present an unsworn statement, we note that the appellant did not decide to exercise his right to remain silent; he made an unsworn statement to the members. Thus the trial counsel was not commenting on the appellant's "right to remain silent." Trial counsel did nothing more than make fair comment on the weight to be given the appellant's unsworn statement, and he did so in a fair, evenhanded manner by simply telling the members almost exactly what the military judge was going to instruct them concerning the appellant's unsworn statement. There was no error.

In his final three allegations of instructional error, the appellant summarily refers to issues he raised in his clemency request addressed to the convening authority. In his fourth assignment of error bearing on this issue, the appellant asserts that the military judge erred in instructing the members that if they concluded that the appellant lied to investigators about attending a party at his apartment complex when Ms. N was allegedly raped, that lie "could be used as evidence of guilt." Clemency Request of 30 Jul 98 at 27. In the fifth assignment of error, the appellant asserts error in the "alibi" instruction. Specifically, the appellant argues that the military judge should have instructed the members that "there has been evidence ... that the victim was not present at the apartment ... at the time she alleges that she was raped." *Id.* at 28. In the sixth, and last, assignment of error alleging instructional error, the appellant takes exception to the instruction concerning a stipulation of expected testimony of a defense witness. Specifically, the military judge instructed the members that they could consider the fact that the witness was not present as a factor affecting the believability of the witness. This instruction, according to the appellant, "devalued the testimony of a key defense witness" who provided testimony that he had seen LCpl P in the appellant's car, "conversing and laughing" with him the day after the alleged indecent assault. *Id.* at 15.

We have considered these last three instructional issues and find no merit in the argument. First the appellant did not object to the instruction given concerning the inference that could be drawn from the appellant's assertion of innocence when confronted with the charges against him. In relation to the "alibi" instruction, not only did the appellant not object, but the instruction given was the exact instruction he requested. Compare the record at 1138 with Appellate Exhibit LVIII, ¶ E, at 1–2. In each of these cases we find waiver, and in relation to the alibi defense we find an affirmative waiver. See *United States v. Gillette*, 35 M.J. 468, 470 (C.M.A.1992). Finally, although the appellant did object to the instruction the military judge gave concerning the weight to be given a stipulation of expected testimony, we find no error. The instruction given was the standard instruction contained in the Military Judges' Benchbook, Dept. of the Army Pamphlet 27–9 at § 7-4-2 (30 Sep 1996).

### Allowing the Victims to Testify
### During Sentencing

■ In his 23rd assignment of error, the appellant alleges that the military judge erred when he allowed, over objection, the victims to testify during the Government's case on sentencing. The appellant had moved to exclude their testimony because they had been in the courtroom during the closing arguments on findings, and because they had been seen talking to each other prior to the closing arguments and during the deliberations of the members. Record at 1159.

Military Rule of Evidence 615 calls for the sequestration of witnesses at the request of either the prosecution or the defense so that one witness will not hear the testimony of other witnesses. If one witness is present during testimony of other witnesses, and later testifies our superior Court has found some prejudice must be shown before relief will be granted. *United States v. Spann,* 51 M.J. 89, 93 (1999). In this case the witnesses were only present for argument on the evidence. After the findings were announced the appellant moved to exclude the two victims from testifying during the sentencing phase of his court-martial. Record at 1159. In response to the motion, the military judge *voir dired* both witnesses to determine what the two had talked about prior to and during deliberations. Record at 1160–62. Both testified that they did not talk about their own testimony, nor discuss anything. Ms. N testified that they had both talked about how they felt the appellant was guilty. *Id.* at 1161. The military judge ruled that the victims would be allowed to testify because he could not determine any disqualifying criteria. Record at 1162.

Even if the military judge erred, the appellant has failed to demonstrate how their presence during closing argument or their brief conversations, "affected the veracity of the testimony provided by the victim[s] ... on sentencing." *Spann,* 51 M.J. at 93. Ac-

cordingly, we find no merit in this assignment of error.[10]

### Post–Trial Discovery

The appellant claims he was denied his right to due process when, after trial, he was not provided a transcript of testimony from the Article 32, UCMJ, investigation. He asserts that exculpatory material was presented at the Article 32, UCMJ, investigation. Based upon the appellant's post trial filings with this court, he claims to have asked for a verbatim transcript prior to his court-martial. At that time he was provided with a verbatim transcript of the testimonies of the Ms. N and LCpl P. Then, on 30 June 1998, 3½ months after the appellant was sentenced, he again requested a verbatim transcript of the entire Article 32, UCMJ, investigation. Rather than providing him with a transcript, the Government made the tapes of the investigation available to the appellant. Clemency Request of 30 Jul 1998 at 26–27. In preparation for presenting his brief before this court, the appellant once again requested a copy of a transcript of the Article 32, UCMJ, investigation on 9 September 1999, but by that time the tapes of the investigation could not be found. See Appellant's Motion to Attach of 29 Feb 2000. We find no error.

The appellant has the burden to show that the evidence was exculpatory in nature and that no other comparable evidence is available. *United States v. Kern,* 22 M.J. 49, 51–52 (C.M.A.1986). The appellant had access to the tapes shortly after trial and apparently elected not to make copies of any pertinent portions of the testimony contained therein that may have been exculpatory. All the appellant offers before this court is speculation, thus he has not met his burden.

### Petition for a New Trial

The appellant's trial concluded on 18 March 1998. Two months later on 14 May 1998, the appellant through his trial defense counsel requested that the convening authority order a post-trial Article 39(a), UCMJ, session to examine a potential issue of either

---

10. We also note that MIL.R.EVID. 615 specifically does not authorize the exclusion of "a person authorized by statute to be present." In light of that language, and 42 U.S.C. § 10606 "Victims' Rights" we find no error in this case. Under 42

U.S.C. § 10606 a "victim" should not be "excluded" unless the court determines that testimony by the victim would be materially affected if the victim heard other testimony at trial.

fraud on the court or newly discovered evidence. The appellant's request was based upon an unsworn statement of LCpl Aguiar, who said that he had a conversation with LCpl P in which she told him that she "had provided false testimony at Cpl Evans' trial." Defense Request for Post Trial Article 39(a) Session and Post Trial Relief of 14 May 1998 at 2. On 8 May 1998, LCpl P prepared an unsworn statement in which she stated that she did not recall having such a conversation. Then on 28 May 1998, she executed a more detailed sworn statement in which she again stated that she did "not recall having a conversation with [LCpl Aguiar] about the Evans trial, we mainly talk only about work." On 3 June 1998 the convening authority denied the request for a post-trial Article 39(a) session. In the denial the convening authority stated:

> A review of your request in the light of [LCpl P's denial] . . . does not convince me that the ends of justice would be served by a post trial 39(a) session. I will examine the record of trial, when prepared, and determine what effect these alleged statements could have had upon the proceedings.

Commanding General letter of 4 Jun 1998. In his recommendation to the convening authority the staff judge advocate appropriately reminded the convening authority of this issue. He also stated his opinion that further proceedings were not needed and that the convening authority could take action as he deemed appropriate. Staff Judge Advocate's Recommendation of 24 Jun 1998 at 3. The issue was again addressed to the convening authority in the appellant's request for clemency of 30 Jul 1998 at 23–25, and by the staff judge advocate at page 2 of his 27 August 1998 Addendum to his recommendation. The convening authority stated that he had considered the request for "a post trial 39(a) session," prior to taking action in the case. Convening Authority's Action dated 17 Sep 1998 at 3. Based on these facts the appellant seeks either a new trial, or that we set aside the appellant's conviction of indecent assault, and order a new sentencing hearing. We decline to do either.

Article 73, UCMJ, 10 U.S.C. § 873, authorizes a petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Where the petition is filed while the case is pending before this court, it is appropriate for this court to take action. *Id.* In addition to Article 73, UCMJ, R.C.M. 1210(f) provides further guidelines for when a new trial can be granted. Where a new trial is requested on the basis of newly discovered evidence, the rule provides that a new trial shall **not** be granted unless the petition for a new trial shows that:

> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2). Additionally, where the basis for the new trial is fraud on the court, "[n]o fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3). In petitioning for a new trial the petitioner is obligated to provide to the authority considering the petition certain, minimal information. Among this information is the requirement that the petitioner provide an "affidavit of each person whom the accused expects to present as a witness in the event of a new trial. Each such affidavit should set forth briefly the relevant facts within the personal knowledge of the witness." R.C.M. 1210(c)(9).

Within this framework, we also know that petitions for new trials are disfavored and should be granted only where the refusal to grant a new trial would result in a "manifest injustice." *United States v. Brooks*, 49 M.J. 64, 68 (1998) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)). In deciding whether to grant a petition for a new trial, we are required to make a factual determination concerning whether the newly discovered evidence would " 'prob-

ably produce a substantially more favorable result for the accused.'" *Brooks,* 49 M.J. at 69 (quoting R.C.M. 1210(f)(2)(C)). By extrapolation we would also be required to make a similar factual determination where fraud on the court-martial has been alleged to determine whether the fraud had a "substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3). Making these factual determinations rests within our broad discretionary powers. *Brooks,* 49 M.J. at 68.

█ We have examined the "newly discovered evidence" presented to us, as well as the alleged fraud on the court, and specifically find that the evidence probably would not produce a substantially more favorable result for the appellant. Additionally, we specifically find that the alleged fraud did not have a substantial contributing effect on either the findings or the sentence in this case. We make this determination upon consideration of the testimony of LCpl P, as well as changing accounts offered by the appellant concerning the indecent assault. We have found that the offered evidence is not "sufficiently believable to make a more favorable result probable." *Id.* at 69. First, we find no reason to question the credibility of LCpl P. Second, the evidence presented to us lacks quality, in that it is not specific as to when and where the conversation with LCpl P took place. Additionally, it does not detail any specific areas of her testimony in which LCpl P lied. Third, the evidence lacks reliability, in that the petition does not contain an affidavit, as required by R.C.M. 1210(c)(9).

Finally, we have considered our authority to return this case to further develop the record and find no reason to do so. The appellant has had over 3 years to perfect his petition, and has failed to do so. In that petitions for new trials are disfavored, it is clear to us that the appellant has the burden of production in this case, and he has failed to meet even the minimal requirements clearly set out in R.C.M. 1210(c). See *United States v. Bacon,* 12 M.J. 489, 491 (C.M.A.1982)(noting that a petitioner for a new trial has a heavier burden than that of an appellant during the normal course of appellate review). We have, however, considered the "evidence" he has presented and have found it sufficient for us to make the credibility determinations we are required to make under *Brooks.* Having done so, we find no merit in this assignment of error.

### Conclusion

Accordingly, the findings and the sentence are affirmed as approved by the convening authority. However, in light of our finding that the appellant was subjected to conditions in pretrial confinement that were both arbitrary and which far exceeded those necessary to ensure the appellant's presence for trial, we order a total of 284 days credit towards his sentence to confinement. This number of days credit awards one extra day of credit for each day of pretrial confinement that the appellant spent in Special Quarters 1 between 18 August 1997 and 10 February 1998, the day the appellant was injured. As a result of that injury the appellant was required to use a wheel chair. For the period of pretrial confinement beginning on 10 February through 17 March 1998, the appellant has been afforded 3 days credit for each day he remained in Special Quarters 1.

Judge VILLEMEZ and Judge OZMUN concur.