*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, GROSS, and DALY
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Juan I. CAMPOS**
Sergeant (E-5), U.S. Marine Corps
*Appellant*

**No. 202200246**

_____

Decided: 29 February 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Benjamin C. Robertson (arraignment)
Adam M. King (motions, trial)

Sentence adjudged 7 July 2022 by a general court-martial convened at Camp Foster, Okinawa, Japan consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for seventy months, and a dishonorable discharge.[1]

---

[1] Appellant received 120 days of confinement credit. Pursuant to the plea agreement, the convening authority granted Appellant's request to defer and then waive automatic forfeitures for the benefit of his wife.

For Appellant:
*Captain Arthur L. Gaston, JAGC, USN* (argued)

For Appellee:
*Lieutenant Commander James P. Wu Zhu, JAGC, USN* (argued)
*Major Mary C. Finnen, USMC* (on brief)

Chief Judge HOLIFIELD delivered the opinion of the Court, in which Judge GROSS and Judge DALY joined.

―――――――――――――

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

―――――――――――――

HOLIFIELD, Chief Judge:

A military judge convicted Appellant, pursuant to his pleas, of one specification of damaging military property, one specification of drunkenly operating a vehicle, one specification of drunk and disorderly conduct, one specification of assaulting his spouse by strangulation, and two specifications of committing a violent offense against his spouse, in violation of Articles 108, 113, 134, and 128b, Uniform Code of Military Justice [UCMJ].[2]

Appellant asserts three assignments of error: (1) Appellant was subjected to illegal pretrial punishment in violation of Article 13, UCMJ; (2) Appellant's trial defense counsel were ineffective for failing to investigate and seek credit for the illegal pretrial punishment Appellant received, failing to discuss material exculpatory evidence with Appellant or provide it to him to review before entering his pleas, and failing to use the exculpatory evidence during his sentencing case; and (3) the military judge abused his discretion by allowing the victim impact statement to discuss other alleged, but uncharged, abuse in order to describe "what type of person he is." We find no prejudicial error and affirm.

―――――――――――――

[2] 10 U.S.C. §§ 908, 913, 934, 928b.

## I. BACKGROUND

On 27 October 2019, shortly after marrying Appellant, Ms. Papa,[3] a Mexican citizen who had never been to the United States, arrived at Marine Corps Air Station (MCAS) Iwakuni. A few months later, on or about 11 January 2020, Appellant pulled Ms. Papa's hair and pushed her against a wall in their home, causing bruising to her back. In June 2020, Ms. Papa was crying because of comments Appellant made about the couple's relationship. In response, Appellant told Ms. Papa, "[I]f you want to cry, cry somewhere else where I can't hear you," and proceeded to hit her in the face, kick her in her shins, and pull her hair.[4] When Ms. Papa reported this incident, Appellant's command counseled him and ordered him to take alcohol abuse classes.

Almost two years later, on 8 March 2022, Appellant became extremely intoxicated after consuming approximately six drinks of whiskey mixed with soda. Ms. Papa, aware of Appellant's level of intoxication, attempted to avoid contact with him by remaining upstairs in the couple's home. At some point, Appellant went upstairs, removed his shirt, and attempted to be affectionate with Ms. Papa, who was lying in bed. When she declined his advances, Appellant pushed Ms. Papa from the bed. This caused Appellant to fall to the floor, likely due to his level of intoxication. While on the floor, Appellant grabbed Ms. Papa by her hair. Ms. Papa then fled the bedroom, making it to the landing before Appellant again forced her onto the floor, this time face down. Appellant wrapped his legs around hers, placed the entire weight of his body on top of her, and put his arm across her throat. Ms. Papa remained trapped in this position for approximately three minutes while being unable to communicate because her airway was blocked. The force of the strangulation caused numerous blood vessels to rupture in Ms. Papa's face.

At some point during the strangulation, Appellant placed his hand around Ms. Papa's neck, with his fingers directly over her throat. Appellant also bit Ms. Papa on the back of her neck, causing bite marks visible hours later. While strangling Ms. Papa, Appellant repeatedly stated in Spanish, "ya vete maldita."[5] "Ya vete" translates as "go away," while "maldita" can mean "various different obscenities."[6]

---

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[4] Pros. Ex. 1 at 1.

[5] R. at 84, 159.

[6] Pros. Ex. 1. at 2.

Eventually, Appellant released his grip enough to allow Ms. Papa to speak and remind him that she was his wife. In response, Appellant asked, "Will you forgive me if I let you go?"[7] When Ms. Papa agreed, Appellant released her and she ran to a neighbor's house. Upon seeing her neighbor, Ms. Papa stated, "[Appellant] tried to kill me!"[8] The neighbor immediately called the police, who soon arrived on scene and found Appellant in the driver's seat of his sports car. Seeing the responding military policeman [MP], Appellant said "f*** you" and drove away.[9]

Appellant proceeded to drive around a residential neighborhood on MCAS Iwakuni at an excessive rate of speed before eventually attempting to overtake a vehicle in the oncoming traffic lane. The result was Appellant crashing into a perimeter fence. After crashing the vehicle, Appellant unsuccessfully tried to scale the perimeter fence. He then screamed "f*** you," "f*** you pigs," and "shoot b****, I told you to f***ing shoot" at the responding MPs.[10] He also called a Hispanic MP a traitor for trying to take him into custody. Appellant is Hispanic.

The MPs ultimately tackled Appellant and took him to a Japanese hospital. While receiving care, Appellant continued to yell obscenities at law enforcement and medical personnel. At 0455 on 9 March 2022, approximately nine hours after Appellant's last drink, tests revealed that Appellant's blood-alcohol content was 0.045.

On 19 May 2022, Appellant and his trial defense counsel signed and submitted a plea agreement under which Appellant would plead guilty to offenses that occurred on the night of 8 March 2022, including: damaging the perimeter fence, drunkenly operating his vehicle, drunk and disorderly conduct, strangling Ms. Papa, and biting Ms. Papa's neck. Additionally, Appellant agreed to plead guilty to assaulting his wife by pulling her hair, striking her in the head, and kicking her on the leg on divers occasions on or between 1 November 2019 and 7 June 2020. Appellant would plead not guilty to biting Ms. Papa on her lip and chest during the same period. Appellant would also plead not guilty to attempting to murder Ms. Papa by strangulation, attempting to wrongfully leave the scene of an accident, using disrespectful language to a sentinel in the exercise of duties, recklessly operating a vehicle, and communicating a threat—all of which took place on 8 March 2022.

---

[7] Pros. Ex. 1. at 3.

[8] R. at 165.

[9] Pros. Ex. 1 at 3.

[10] Pros. Ex. 1 at 3; Pros. Ex. 9-10.

Among the provisions of the signed plea agreement, Appellant specifically agreed "to waive all motions except those that are non-waivable pursuant to R.C.M. 705(c)(1)(B) or otherwise."[11] As for the Government, the agreement required the convening authority to limit Appellant's total confinement to between 60 and 72 months and to withdraw and dismiss the language, charges, and specifications to which Appellant pleaded not guilty.[12]

At his 6 July 2022 guilty plea colloquy, Appellant told the military judge that on 8 March 2022 he "blacked out" "from the last time I remember having a drink until I woke up at the Japanese hospital."[13] He further stated: "I do not remember what happened, but seeing the evidence and – I believe that I committed the offense."[14] Hearing this, the military judge took a brief recess, during which he learned that "[Appellant] was going to have a similar response to all of the offenses to which [Appellant] has pleaded guilty to that occurred on or about 8 March of 2022."[15]

When the military judge later asked him to explain why he was guilty of strangling his wife, Appellant responded, "I do not remember what happened, sir."[16] But Appellant explained that he read his wife's statements; viewed photographs, an NCIS video, and crime scene documentation; and read the Provost Marshal Office's report of the incident.

When asked if he was "satisfied that the reports and statements that [he] received are true and correct," Appellant responded, "Yes, sir."[17] The military judge went on to ask whether Appellant had any "reason to believe that the victim or the witnesses would lie about what [Appellant] did on or about 8 March 2022?"[18] Appellant responded, "No, sir."[19] The military judge further asked Appellant whether he was "satisfied that [he] received all of the evidence

---

[11] Appellate Ex. III at 6.

[12] Under the terms of the plea agreement, all confinement would be served concurrently. Thus, the maximum total confinement was determined by the 60 to 72 month range required for the strangulation charge. Without the strangulation, the minimum and maximum confinement would have been 12 months.

[13] R. at 39-40, 68.

[14] R. at 48.

[15] *Id.*

[16] R. at 71.

[17] R. at 73.

[18] *Id.*

[19] *Id.*

in the possession of the prosecution pertaining to this offense, both favorable and unfavorable"; whether he considered "all of the evidence"; and whether after "considering all of the evidence and discussing the case with [his] defense counsel, [Appellant believed he] committed the offense."[20] To each of these inquiries, Appellant responded, "Yes, sir," and further indicated he had no doubt as to whether he strangled Ms. Papa.[21] A similar, thorough colloquy then occurred regarding the 8 March 2022 specification of biting Ms. Papa.

Later, when the military judge asked whether he remembered the domestic violence that occurred on divers occasions between on or about 1 November 2019 and 7 June 2020, Appellant responded, "No, sir, I do not."[22] After a short recess, Appellant responded, "Yes, sir. I'm not too – I do not really remember, like, the exact details, but I do remember the incidents."[23] Upon hearing Appellant describe each instance of domestic violence, the military judge accepted his plea as provident.

Prior to the next day's presentencing hearing, Ms. Papa submitted to the trial court a written victim impact statement.[24] Trial defense counsel objected to any statements concerning allegations of abusive conduct to which Appellant had not pleaded guilty, including "yelling at [Ms. Papa] occasionally," "grab[bing] and pull[ing] on [her] arms," "hav[ing] [her] immobilized against the wall," "tak[ing] [her] phone away," and "cut[ting] the Internet off which restricted [her] communication with anyone outside of [their] home."[25] Trial defense counsel argued these statements were irrelevant, improper, and outside the scope of victim impact statements allowed under Rule for Courts-Martial [R.C.M.] 1001(c).[26]

The military judge overruled this objection, finding the statement "provides context for the Court . . . to understand the impact of the offenses for which the [Appellant] is to be sentenced."[27] The military judge further found that the objected-to portions of the statement addressed "a continuous course of conduct

---

[20] R. at 74-75.

[21] *Id.*

[22] R. at 99.

[23] R. at 103.

[24] Appellate Ex. VIII.

[25] R. at 185-87, 204.

[26] R. at 185-87.

[27] R. at 198.

regarding similar crimes" and that the statements addressed "[d]omestic violence, including physical and emotional intimidation and isolation against the same victim . . . in the same general location in and around their residence" over a "relatively close timeframe," noting that Appellant and Ms. Papa "had only lived together at this time since October 2019."[28] As such, the military judge allowed Ms. Papa to read her statement in its entirety, including: "I am standing here telling all of you what type of person [Appellant] is and how he impacted me. I want to ensure he never does this to anyone else when he is released."[29]

After also receiving evidence in aggravation, extenuation and mitigation, the military judge sentenced Appellant to a reduction to E-1, confinement for 70 months, and a dishonorable discharge.

On appeal, Appellant filed a Motion to Attach containing his sworn declaration. In the declaration, Appellant states he was held in maximum security for the first nine days of his pretrial confinement in the MCAS Iwakuni brig. Appellant also maintains he was only allowed to leave his cell during the first two days to exercise for twenty minutes in full shackles and to shower. For the other seven days Appellant attests he was allowed to leave his cell for an hour. He also claims that, while in maximum security, he was unable to have visitors aside from a command representative, chaplain, and his trial defense counsel.

At trial, when the military judge specifically asked whether Appellant had "been punished in any way that would constitute illegal pre-trial punishment under Article 13,"[30] both Appellant and his trial defense asserted that he had not. Appellant now contends he "did not know what [the military judge] was talking about" when this colloquy occurred.[31]

Appellant's Motion to Attach also contained documents concerning a statement Ms. Papa made to a Family Advocacy Program [FAP] counselor in June 2020. The documents indicate that Ms. Papa had previously "described incidents of emotional abuse, reported physical bruises and bites to Law [sic] enforcement but denied such allegations while assessed with FAP."[32] The counselor's summary further noted that Ms. Papa "expressed being worried about

---

[28] *Id.*

[29] R. at 208.

[30] R. at 145.

[31] Appellant's Decl. at 1-2.

[32] Appellant's Decl., Attachment 3.

impacting [Appellant's] career."[33] The Motion to Attach also included an Incident Determination Committee [IDC] report documenting that allegations of adult physical maltreatment by Appellant against Ms. Papa were deemed to "not meet criteria" for domestic violence.[34]

Although trial defense counsel received the FAP/IDC documents on 23 May 2022, Appellant maintains they were never discussed with him. Moreover, he claims that, had he seen them, he would not have pleaded guilty to either the 2019-2020 or 2022 domestic violence charges.

This Court ordered trial defense counsel to submit declarations regarding Appellant's allegations. We received the affidavits on 10 October 2023. Trial defense counsel 1 [TDC1] states he visited Appellant at the Iwakuni brig "regularly" and maintains he "observed nothing that raised Article 13 concerns."[35] His observations led him to think that brig staff were properly following relevant regulations and he heard nothing from Appellant to make him think otherwise. While TDC1 was able to secure Appellant's transfer to the brig in Okinawa, it was because that brig offered more resources and improved conditions.

Trial defense counsel 2's [TDC2] declaration similarly maintained Appellant's conditions did not constitute a violation of Article 13. Specifically, TDC2 stated that, given the serious nature of Appellant's alleged crimes, the injuries to Ms. Papa, and the fact she lived only a short distance from the brig, it was reasonable and lawful for Appellant to be held under the brig's most restrictive procedures. And, as with TDC1, TDC2 noted Appellant never informed him of the conditions he now claims in his declaration.

As for the FAP report, neither trial defense counsel believed the evidence to be material or exculpatory. TDC1 believed Appellant had the opportunity to review the FAP report with TDC2 in Okinawa. He also believed the documents were of little value but presented great risk, given other corroborating evidence—including that the IDC separately determined another 2020 incident

---

[33] *Id.*

[34] Appellant's Decl., Attachment 4. The IDC is "[a] multidisciplinary team of designated individuals working at the installation level, tasked with the evaluation of reports of domestic and child abuse to the FAP to determine whether they meet the relevant criteria for alleged domestic and child abuse for entry into the Service FAP Central Registry of domestic and child abuse reports." Chief of Naval Operations Instr. 1752.2C, *Family Advocacy Program*, App'x C-7 (20 May 2020). It is not clear from the report what allegations the IDC considered in this instance.

[35] Trial Defense Counsel 1 Decl. at 1-2.

involving Appellant "met criteria for spousal abuse."[36] Accordingly, TDC1 believed introducing the FAP report "could have opened the door to rebuttal evidence and contributed to a cycle-of-abuse narrative for the Government."[37]

TDC2 similarly appraised the FAP report as non-exculpatory, as the abuse occurred on multiple occasions. He also stated that Appellant was given and reviewed all evidence provided by the Government. And TDC2 noted that Appellant would have known about the IDC's negative finding regardless, as it lifted a no-contact order and allowed Appellant to move back into his residence with Ms. Papa.

Additional facts necessary for our analysis are provided below.

## II. DISCUSSION

### A. Appellant was not subjected to illegal pretrial punishment in violation of Article 13, UCMJ.

Appellant argues the Government arbitrarily subjected him to unduly harsh confinement conditions in violation of Article 13, UCMJ. Additionally, Appellant asserts he did not waive the issue of pursuing confinement credit when he responded negatively to the military judge's question asking whether he had experienced illegal pretrial confinement.

#### 1. Standard of Review and Law

Whether an appellant has been subject to illegal pretrial confinement in violation of Article 13, UCMJ, is a mixed question of law and fact.[38] An appellant bears the burden of establishing entitlement to additional confinement credit for a violation of Article 13—a question we review de novo.[39] Whether an appellant has waived an issue is a question of law we review de novo.[40] "[W]here a military judge is faced with a pretrial agreement that contains an Article 13 waiver, the judge should inquire into the circumstances of the pretrial confinement and the voluntariness of the waiver, and ensure that the accused understands the remedy to which he would be entitled."[41] Absent plain

---

[36] Trial Defense Counsel 1 Decl. at 8.

[37] Trial Defense Counsel 1 Decl. at 9.

[38] *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002).

[39] *Id.*

[40] *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

[41] *United States v. McFadyen*, 51 M.J. 289, 291 (C.A.A.F. 1999).

error, however, failure to allege an Article 13 violation at trial waives the issue.[42]

Article 13, UCMJ, provides:

> No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

Article 13 prohibits two things: illegal pretrial punishment and illegal pretrial confinement.[43] Punitive intent is one significant factor when determining whether an Article 13 violation has occurred.[44] If an accused or appellant can demonstrate a violation of Article 13, then he or she is entitled to sentence relief.[45] But, while "violations of service regulations prescribing pretrial confinement conditions provide a basis" for a discretionary grant of additional credit, such violations "do not independently trigger a per se right to such credit enforceable by the servicemember."[46] Additional confinement credit is appropriate where "confinement officials have knowingly and deliberately violated provisions of service regulations designed to protect the rights of presumptively innocent servicemembers."[47]

*2. Analysis*

While not required, it would have been helpful if the military judge had engaged in a more detailed colloquy with Appellant regarding the plea agreement's Article 13 waiver, thereby establishing Appellant's understanding of the term. We have examined the conflicting descriptions of the conditions of Appellant's confinement contained in the various declarations before us. And, finally, we note that Appellant did not allege an Article 13 violation at trial, but now seeks to avoid waiver by framing the issue as a failure by his counsel to explain the matter. However, we need resolve neither the question of waiver nor the conflicting assessments of the confinement conditions. Even treating

---

[42] *United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003).

[43] *Id.* at 463.

[44] *Mosby*, 56 M.J. at 310 (citations omitted).

[45] *Id.*

[46] *United States v. Adcock*, 65 M.J. 18, 25 (C.A.A.F. 2007).

[47] *Id.*

the matter as not waived and accepting Appellant's version of his treatment in the Iwakuni brig, Appellant has failed to show that the conditions of his confinement were arbitrary or unduly rigorous under the circumstances.

He was charged, *inter alia*, with repeatedly, violently assaulting his wife, attempting to kill his wife, attempting to leave the scene of an accident, and threatening to kill another Marine. Thus, it was not objectively unreasonable for brig personnel to treat him as a "maximum custody" detainee "requiring special custodial supervision because of the high probability of escape," being "potentially violent or dangerous, and whose escape would cause concern of a threat to life, property, or national security."[48] Although the relevant service regulation requires even maximum custody detainees to "have the opportunity to be outside of their cell for at least 2 hours daily," this mandate can be overcome if a detainee presents safety or security concerns.[49]

Appellant has failed to establish that the claimed conditions of his confinement violated service regulations or were otherwise unduly harsh. Furthermore, he also has failed to show any punitive intent behind his pretrial confinement—and we decline to infer such intent from the circumstances presented.[50]

## B. Appellant's trial defense counsel were not ineffective.

Appellant asserts his trial defense counsel were ineffective for failing to: (1) investigate and seek credit for the pretrial confinement conditions Appellant received while at the Iwakuni brig; (2) discuss or provide him with exculpatory evidence (the 2020 FAP report) before Appellant entered his pleas; and (3) use that exculpatory evidence during sentencing.

---

[48] Dep't of the Navy, Corrections Manual (SECNAV M-1640.1) para 4201.2.a (15 May 2019).

[49] *Id*. at para 4205.3.d.

[50] In his brief, Appellant cites to *United States v. Evans,* 55 M.J. 732 (N-M. Ct. Crim. App. 2001) as an example of where this Court awarded additional confinement credit based on similar conditions. But that case involved unreasonable, blind adherence to a standard operating procedure tied, at least in part, to the potential length of sentence faced, imposing conditions of maximum custody even after the appellant was injured and confined to a wheelchair. That is not this case.

### 1. Standard of Review and Law

We review claims of ineffective assistance of counsel de novo.[51] To prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[52] The appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[53] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[54]

To establish deficiency, an appellant must first overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[55] A military appellate court "will not second-guess the strategic or tactical decisions made at trial by defense counsel."[56] If an appellant raises the issue of ineffective assistance of counsel based upon a challenge against the trial strategy or tactics of the defense counsel, "the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'"[57] Strategic decisions to accept or forgo a potential benefit are not deficient when the decisions are objectively reasonable.[58] Furthermore, "it is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice."[59] "When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . an appellant must show that there is a reasonable

---

[51] *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009); *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[52] *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (other citation omitted).

[53] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008).

[54] *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[55] *United States v. Scott*, 81 M.J. 79, 84 (C.A.A.F. 2021) (quoting *Strickland*, 466 U.S. at 489).

[56] *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001) (quoting *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993)).

[57] *Mazza*, 67 M.J. at 475 (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)) (cleaned up).

[58] *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012).

[59] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012). *See also, Strickland*, 466 U.S. at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.").

probability that such a motion would have been meritorious."[60] Lastly, where an appellant has pleaded guilty, he must "show specifically that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[61]

*2. Analysis*

*a. Failure to investigate conditions of pretrial confinement or seek additional confinement credit was not deficient performance*

As discussed above, we find the conditions of Appellant's pretrial confinement at MCAS Iwakuni did not warrant confinement credit beyond the day-for-day credit the military judge awarded. Since any motion for additional confinement credit would not have been meritorious, there could be no prejudice and we need not decide whether his trial defense counsel were ineffective on this point.

*b. Failure to discuss or provide Appellant with the 2020 FAP Report*

Appellant claims he never received or reviewed the FAP report. His trial defense counsel dispute this. But we can decide the matter by assuming *arguendo* that Appellant's version is correct and that his counsel's failure to discuss with him the 2020 FAP report constituted deficient performance, because Appellant fails to prove prejudice. Given the strength of the Government's evidence, as well as Appellant's own words and actions at his trial, we find no reasonable probability that Appellant would have contested the most serious charges to which he pleaded guilty had he only known of the FAP report.

First, the evidentiary value of the FAP report is low. At best, it shows that Ms. Papa, two years earlier, had recanted on a claim of domestic abuse. It does nothing to counter the physical evidence of strangulation, Ms. Papa's immediate, frantic report to her neighbor, or her excited utterance ("he tried to kill me!").[62] Each of these alone supports Ms. Papa's description of the March 2022 assault; combined, they appear insurmountably strong.

Second, arguably the greatest benefit Appellant received in entering into his plea agreement was the withdrawal and dismissal of the attempted murder

---

[60] *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007).

[61] *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

[62] R. at 165.

charge. This effectively took a life sentence off the table. Given the strong corroborative evidence of his March 2022 attack of Ms. Papa, the chance of Appellant's conviction of attempted murder was far from zero.

Third, the theme of Appellant's unsworn statement was apologizing to his wife and conveying his wish that they might repair their relationship. At one point, he even got down on his knees to address her in the courtroom, causing the military judge to rebuke his counsel. Salvaging his marriage was clearly Appellant's main objective. Pleading not guilty and contesting the charges and Ms. Papa's testimony would have frustrated this aim.

Fourth, the FAP report also contained information that could hurt Appellant's case. While the report indicates Ms. Papa reported "emotional abuse" and "bruises and bites to Law [sic] enforcement but denied such allegations" to the FAP counselor, it also provides a potential explanation of the denial: "Victim expressed being worried about impacting her spouse's career."[63]

It is inconceivable that these one or two sentences in 1900-plus pages of discovery materials would have led Appellant to plead not guilty to the strangulation specification in the face of the overwhelming physical evidence of his misconduct on 8 March 2022. It is also simply not reasonable to believe that he would have forgone the protections of his plea agreement and faced a potential life sentence for attempted murder by pleading not guilty to the less serious, 2019-2020 misconduct alleged in the Additional Charge.

### c. Failure to use exculpatory evidence in sentencing

Appellant's trial defense counsel describe strategic reasons for not using the FAP report, mainly, that the report's value was low and the potential risks it raised were high. This decision was objectively reasonable, whether assessing its use for exculpatory purposes at a contested trial or for mitigation in sentencing. Accordingly, we will not second-guess their decision.

Specifically regarding use of the FAP report for sentencing following Appellant's guilty plea, we fail to see how it would not have undermined Appellant's pleas to the 8 March 2022 domestic assaults. When the military judge asked Appellant why he thought he was guilty of strangling and biting his wife, Appellant explained that, due to his level of intoxication that night, he did not remember what happened. However, Appellant believed he was guilty based on having read his wife's statement and being satisfied that the statement was true and correct. He further denied that he had any reason to believe his wife

---

[63] Appellant's Decl., Attachment 3.

would lie about what happened that night. Based on these and other responses, the military judge accepted Appellant's pleas.

As Ms. Papa's statements were key to Appellant's belief that he was guilty of the 8 March 2022 assaults, any effort to undermine her credibility by demonstrating an earlier recantation of another assault claim would render Appellant's plea improvident. The prejudice Appellant complains of is a chimera.

Accordingly, we find no merit in Appellant's claim that he received ineffective assistance of counsel. We turn next to his claims regarding the military judge's ruling to admit Ms. Papa's victim impact statement.

## C. The military judge did not abuse his discretion by allowing the victim impact statement.

Appellant argues the military judge abused his discretion by allowing Ms. Papa, through her unsworn victim impact statement, to discuss alleged abuse of which Appellant was not convicted. Appellant further contends the military judge committed plain error by allowing the victim impact statement to convey that Appellant should be punished for the "type of person he is."

### 1. Standard of Review and Law

"We review a military judge's decision to allow a victim to present an unsworn victim impact statement for abuse of discretion."[64] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[65]

Pursuant to R.C.M. 1001(c)(3), the contents of victim impact statements may only include matters in mitigation and "victim impact," which is defined to include "any financial, social, psychological, or medical impact on the crime victim *directly relating to or arising from* the offense of which the accused has been found guilty."[66] "A victim's statement should not exceed what is permitted under R.C.M. 1001(c)(3)," and "[u]pon objection by either party or *sua sponte*,

---

[64] *United States v. Miller*, 82 M.J. 788, 791 (N-M Ct. Crim. App. 2022) (citing *United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019) (recognizing that victim impact statements are not evidence but applying the same standard of review to their admission)).

[65] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations and internal quotation marks omitted).

[66] R.C.M. 1001(c)(2)(B) (emphasis added).

a military judge may stop or interrupt a victim's statement that includes matters outside the scope of R.C.M. 1001(c)(3)."[67] "While the military judge is the gatekeeper for unsworn victim statements, an accused nonetheless has a duty to state the specific ground for objection in order to preserve a claim of error on appeal."[68]

"When determining whether an error substantially influenced a sentence, this Court considers the following four factors: '(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question.'"[69]

Furthermore, judges are "presumed to know the law and apply it correctly."[70] Absent clear evidence to the contrary, we will assume the military judge did not sentence Appellant on any improper basis.[71]

*2. Analysis*

The phrase "directly relating to or arising from the same offense" in the context of victim impact statements is not defined in R.C.M. 1001(c). It has, however, been defined in relation to evidence in aggravation admitted under R.C.M. 1001(b). Our superior Court has held that evidence of uncharged misconduct offered in aggravation "is directly related to the conduct for which appellant was found guilty" where it shows "a continuous course of conduct involving the same or similar crimes, the same victims, and a similar situs within the military community, *i.e.,* the servicemember's home."[72] Part of the Court's rationale was that the evidence showed "the true impact of the charged offenses on the [victims]."[73]

---

[67] R.C.M. 1001(c)(5)(B), Discussion.

[68] *United States v. Tyler*, 81 M.J. 108, 113 (C.A.A.F. 2021).

[69] *Hamilton*, 78 M.J. at 343 (equating erroneous admission of an unsworn victim impact statement to the erroneous admission of evidence in aggravation) (citing *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)).

[70] *United States v. Bridges*, 66 M.J. 246, 248 (C.A.A.F. 2008) (citation omitted).

[71] *Id.*

[72] *United States v. Mullens*, 29 M.J. 398, 400 (C.M.A. 1990); *see also United States v. Nourse*, 55 M.J. 229, 232 (C.A.A.F. 2001) ("when uncharged misconduct is part of a continuous course of conduct involving similar crimes and the same victims, it is encompassed within the language 'directly relating to or resulting from the offenses of which the accused has been found guilty' under RCM 1001(b)(4).").

[73] *Nourse*, 55 M.J. at 231.

It only makes sense to apply this same definition to the victim impact statement in this case. Under R.C.M. 1001(c), a crime victim "has the right to be reasonably heard" concerning "any financial, social, psychological, or medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty." This right would prove illusory if it did not include the ability to describe circumstances necessary for the sentencing authority to understand the true impact of the crime on the victim.

Here, the military judge said he considered the uncharged domestic abuse as "a continuing course of conduct involving similar crimes" and that Ms. Papa's description of that abuse "provides context to the court . . . to understand the impact of the offenses for which the accused is to be sentenced."[74] But the military judge also emphasized that he was sentencing Appellant "only for the offenses that he has been found guilty."[75]

We find that the military judge's decision to allow Ms. Papa to describe the uncharged domestic abuse was reasonable. Therefore, there was no abuse of discretion.

After describing in detail (over four transcribed pages) Appellant's specific acts of abuse and how they affect her daily life, Ms. Papa concluded with: "I am thankful I am alive, though, because I am standing here telling all of you what type of person [Appellant] is."[76] Appellant argues this broad comment was outside the scope of R.C.M. 1001(c). We disagree. If anything, this is no more than an obvious, logical conclusion based on Ms. Papa's entire impact statement and the offenses to which Appellant pleaded guilty: that Appellant is someone who physically abused and strangled his wife. Furthermore, we find that neither Ms. Papa's "type of person" comment nor her statement that she "want[ed] to ensure [Appellant] never does this to anyone else when he is released," constituted a request for a specific sentence or for more punishment than the evidence merited.[77]

Even if we were to find that the military judge abused his discretion, we conclude there was no prejudice. The Government's sentencing case was strong, including: Appellant's statements made during his guilty plea; details contained in the stipulation of fact; and the extent of the physical harm inflicted on his wife—extensive bruising, petechiae, the obvious bite mark—as

---

[74] R. at 198.

[75] R. at 199.

[76] R. at 208.

[77] *Id.*

evidenced by photographs and witness testimony. In contrast, the Defense's sentencing evidence was relatively weak, consisting primarily of his record of military service.

Ms. Papa's description of uncharged abuse was material in that it put the impact of the domestic violence in context. Also, the quality of her victim impact statement was high, specifically her description of the severe, lasting debilitating effect of Appellant's abuse. In contrast, however, the language of which Appellant now objects—what "type of person he is"— is of relatively low quality and low material impact.[78] We are confident it played no part in the military judge's sentencing decision.

---

[78] *Id.*

### III. CONCLUSION

After careful consideration of the record, along with the briefs and arguments of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[79]

However, we note that the Entry of Judgment does not accurately reflect the disposition of the charges. The Entry of Judgment incorrectly states that the military judge found Appellant not guilty of those charges and specifications to which he pleaded not guilty. In fact, those charges and specifications were withdrawn and dismissed prior to announcement of findings. Although we find no prejudice, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[80] In accordance with Rule for Courts-Martial 1111(c)(2), we modify the Entry of Judgment and direct that it be included in the record.

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[79] Articles 59 & 66, UCMJ.

[80] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | **NMCCA NO. 202200246** |
| **v.** | **ENTRY** |
| | **OF** |
| **Juan I. CAMPOS** | **JUDGMENT** |
| **Sergeant (E-5)** | |
| **U.S. Marine Corps** | |
| *Accused* | *As Modified on Appeal* |
| | **29 February 2024** |

On 25 May 2022 and 7 July 2022, the Accused was tried at Camp Foster, Okinawa, by a general court-martial, consisting of a military judge sitting alone. Military Judges Benjamin C. Robertson and Adam M. King presided.

## FINDINGS

The following are the Accused's pleas and the Court's findings to all offenses the convening authority referred to trial:

**Charge I:** **Violation of Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880.**

> *Plea:* Not Guilty
> *Finding:* Withdrawn and dismissed.

**Specification 1:** **Attempted murder on or about 8 March 2020.**

> *Plea:* Not Guilty.
> *Finding:* Withdrawn and dismissed.

**Specification 2:** **Attempted fleeing the scene of an accident on or about 8 March 2020.**

> *Plea:* Not Guilty.
> *Finding:* Withdrawn and dismissed.

**Charge II:** **Violation of Article 95a, Uniform Code of Military Justice, 10 U.S.C. § 895a.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed.

**Specification:** **Disrespect toward sentinel or lookout on or about 8 March 2022.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed.

**Charge III:** **Violation of Article 108, Uniform Code of Military Justice, 10 U.S.C. § 908.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification:** **Damaging military property on or about 8 March 2022.**

*Plea:* Guilty.

*Finding:* Guilty.

**Charge IV:** **Violation of Article 113, Uniform Code of Military Justice, 10 U.S.C. § 913.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification 1:** **Drunken operation of a vehicle on or about 8 March 2022.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification 2:** **Reckless operation of a vehicle on or about 8 March 2022.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed.

**Charge V:** **Violation of Article 115, Uniform Code of Military Justice, 10 U.S.C. § 915.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed.

**Specification:** **Communicating a threat on or about 8 March 2022.**

*Plea:* Not Guilty.

*Finding:* Withdrawn and dismissed.

**Charge VI:** **Violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. § 928b.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification 1:** **Assaulting a spouse by strangulation on or about 8 March 2022.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification 2:** **Commission of a violent offense against a spouse on or about 8 March 2022.**

*Plea:* Guilty.

*Finding:* Guilty.

**Charge VII:** **Violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.**

*Plea:* Guilty.

*Finding:* Guilty.

**Specification:** **Disorderly Conduct, Drunkeness on or about 98 March 2022.**

*Plea:* Guilty.

*Finding:* Guilty.

**Additional Charge:** **Violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. § 928b.**

*Plea:* Guilty.

*Finding:* Guilty by exceptions.

**Specification:** **Commission of a violent offense against a spouse on divers occasions between on or about 1 November 2019 and 7 June 2020.**

*Plea:* Guilty, excepting the words "and bite J.A.P.P. on the lips and chest with the accused's teeth."

*Finding:* Guilty, excepting the words "and bite J.A.P.P. on the lips and chest with the accused's teeth."

3

## SENTENCE

On 7 July 2022, a military judge sentenced the Accused to the following:

**Reduction to pay grade E-1.**

**Confinement**

> *For the Specification Charge III:*
> confinement for 2 months.

> *For Specification 1 of Charge IV:*
> confinement for 6 months.

> *For Specification 1 of Charge VI:*
> confinement for 70 months.

> *For Specification 2 of Charge VI:*
> confinement for 12 months.

> *For the Specification of Charge VII:*
> confinement for 4 months.

> *For the Specification of the Additional Charge:*
> confinement for 12 months.

> The terms of confinement will run concurrently.

**Confinement for a total of 70 months.**

**A dishonorable discharge.**

The Accused shall be credited with 120 days of pretrial confinement.

### DEFERMENT AND WAIVER

On 1 June 2022, the accused requested the convening authority defer and waive automatic forfeitures the accused is due during his enlistment, provided that the accused establish and maintain a dependent's allotment in the total amount of the forfeiture amount during the entire period of confinement. The convening authority granted this request on 20 July 2022, with the deferral commencing 14 days after the sentence was adjudged until the date of entry of judgment. All automatic forfeitures shall be waived for a period of 6 months or the expiration of the accused's term of service, whichever is sooner, with the waiver commencing on the date of the entry of judgment. All pay and allowances shall be paid to the accused's wife.

On 15 June 2022, the accused requested the convening authority grant a seven-month reduction to his confinement sentence and suspension of his adjudged reduction in rank for five months for the benefit of his wife. On 20 July 2022, the convening authority denied each of these requests.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court